UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

```
                                        )
THOMAS NAGEL,                           )
                                        )
                    Plaintiff,          )
                                        )          CIVIL ACTION
              v.                        )          NO. 17-00066-WGY
                                        )
CITY OF JAMESTOWN, North                )
Dakota, and SCOTT EDINGER,              )
individually and in his official        )
capacity as Chief of the Police         )
Department of Jamestown,                )
                                        )
                    Defendants.         )
                                        )
```

YOUNG, D.J.[1]                                          August 2, 2018

## MEMORANDUM & ORDER

## I.    INTRODUCTION

The Plaintiff Thomas Nagel ("Nagel") brought this suit

against the Defendants City of Jamestown, North Dakota (the

"City"), and Scott Edinger, the Chief of the Police Department

of Jamestown ("Edinger," and collectively with the City, the

"Defendants") alleging violations of his federal and state

constitutional rights.  Pending before the Court are the

Defendants' motion for summary judgment and Nagel's motion for

partial summary judgment.  For the reasons stated herein, the

---

[1] Of the District of Massachusetts, sitting by designation.

Court GRANTS the Defendants' motion for summary judgment on Counts I, II and IV and DENIES Nagel's motion for partial summary judgment. The Court dismisses Count III without prejudice.

**A.    Procedural History**

On April 5, 2017, Nagel filed a complaint in the United States District Court for the District of North Dakota against the City and the chief of its police department, Edinger. Compl. ¶¶ 21-48, ECF No. 1. In his complaint, Nagel alleges a violation of his First Amendment rights under 42 U.S.C. § 1983 (Count I); a violation of his Fourteenth Amendment right to due process under 42 U.S.C. § 1983 (Count II); a violation of his constitutional rights under Article I, sections 4, 5 and 9 of the North Dakota Constitution (Count III); and a violation of the North Dakota Administrative Code Chapter 4-07-19 (Count IV). Id.

On April 3, 2018, the Defendants filed a motion for summary judgment. Defs.' Mot. Summ. J., ECF No. 23. The parties fully briefed the issues. Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem."), ECF No. 24; Pl.'s Resp. Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 49; Defs.' Reply Pl.'s Resp. Mot. Summ. J. ("Defs.' Reply"), ECF No. 54. Nagel also filed a motion for partial summary judgment on Count II, a portion of Count III, and Count IV. Pl.'s Mot. Partial Summ. J., ECF No. 38. This motion was

fully briefed as well.  Pl.'s Mem. Supp. Partial Summ. J.
("Pl.'s Mem."), ECF No. 43; Defs' Mem. Opp'n Partial Summ. J.
("Defs.' Opp'n"), ECF No. 47; Pl.'s Reply Defs' Resp. Mot.
Partial Summ. J. ("Pl.'s Reply"), ECF No. 51.

On June 1, 2018, this Court heard oral argument on both
motions and took the matter under advisement.  See ECF Nos. 55,
57.

### B.    Factual Background[2]

On April 16, 1989, Nagel started working for the Jamestown
Police Department.  Aff. Brian D. Schmidt ("Schmidt Aff."), Ex.
1 at 3, ECF No. 26-1.  Edinger was the Chief of the Police
Department and Nagel's supervisor at all material times.  Aff.
Scott Edinger ("Edinger Aff.") ¶ 1, ECF No. 37.  Nagel was also
affiliated with the Fraternal Order of Police, a labor union
that represents some members of the police department.  Compl. ¶
2.  In 1998, Nagel founded the James Valley Regional Lodge
Number 4 of the Fraternal Order of Police and became its
president for a period of eighteen years.  Schmidt Aff., Ex. 2
("CSC Hearing Transcript"), 154:11-19, ECF No. 26-2.  As the
president, Nagel advocated for a change in the retirement system
of city employers.  Schmidt Aff., Ex. 4, ¶ 12, ECF No. 26-4.

---

[2] The facts are undisputed, unless otherwise stated.

Nagel's advocacy and behavior in some meetings created tension with his superiors.  Edinger Aff. ¶¶ 2-9.

In 2013, after attending a class in which it was recommended to police officers to use pseudonyms on social media, Nagel changed his Facebook name to "Dominic Brimm" and privatized his account.  CSC Hearing Transcript at 156:11-157:6. According to Nagel's testimony, he also created a false Facebook account under the name of Robert Hines, who posed as a local kid who had dropped out of school.  Id. at 158:20-23.  Nagel used the Hines account to spy on people that the police department was investigating.  Id. at 158:11-25, 159:1-18; Schmidt Aff., Ex. 5 ("Nagel's Deposition"), 60:1-61:18, ECF No. 26-5.  Using the Hines account, Nagel clicked on the Facebook page of Matt Thom ("Thom"), the Stutsman County Deputy, and saw a picture of Thom riding a jet-ski with the son of Stutsman County Sheriff Kaiser ("Sheriff Kaiser").  Id. at 62:5-63:7.

In early November 2015, KVLY, a television station in Fargo, North Dakota, received a tip from a "Dominic Brimm" about the improper conduct of some members of the Stutsman County Sheriff's Department.  Edinger Aff. ¶ 10.  The hotline tip alleged that a county-owned jet-ski had been used by a member of the Stutsman County Sheriff's Office ("Sheriff's Office") for personal purposes, and included the Facebook picture.  Aff. Thomas Nagel ("Nagel Aff.") ¶¶ 5-6, ECF No. 45.  After receiving

the tip, Valley News Live reporter Christine Stanwood ("Stanwood") came to the Stutsman County courthouse on November 4, 2015. Edinger Aff. ¶ 10. Nagel then had a camera interview with Valley News Live, in which he commented on an alleged crime commited by a member of the Sheriff's Office who had used a government-owned jet-ski for personal use. Compl. ¶¶ 7-8; Schmidt Aff., Ex. 3 ("VNL Interview"), ECF No. 26-3. In the interview, Nagel aknowledged that Dominic Brimm was the alias he went by on Facebook. VNL Interview at 1:45-1:52. He said that he knew about the picture but denied being the one who sent it to Valley News Live. Id. at 2:09-2:14. When asked about who did, he answered: "I can say it is somebody that would be in fear of losing their job." Id. at 2:21-2:26.

After the interview, Nagel went to Edinger's office and told him that he knew who had submitted the tip. CSC Hearing Transcript at 263:10-265:22. That afternoon, Nagel visited attorney Joseph Larson ("Larson"). Nagel's Deposition at 118:11-25. In Larson's office, Nagel talked to the North Dakota Game and Fish Department and verified that the County did not own a jet-ski. Id. at 121:8-122:1.

After the Valley News Live interview, the County prohibited Nagel's Fraternal Order from holding any meetings or activities on County properties, and required the Fraternal Order to remove

vending machines from which it profited and the ATM it housed in the County building.  Id. at 126:1-6.

Nagel filed two grievances against Edinger.  Nagel filed the first grievance after Edinger told him that some people wanted his resignation.  Edinger Aff. ¶ 22; Nagel's Deposition at 126:10-18;  CSC Hearing Transcript at 272:1-5.  Edinger responded to the grievance by explaining that Casey Bradley, the Stutsman County Auditor, had mentioned this to him and that no formal request for the resignation had been made.  Edinger Aff., Ex. 4, ECF No. 37-4.  On November 5, 2015, Sherriff Kaiser told Edinger that he wanted Nagel to stay out of the Sheriff's Office.  Edinger Aff. ¶ 23; CSC Hearing Transcript at 273:22-274:2.  The Sheriff's Office and Police Department offices are located within the same building and are separated by a hallway.  Edinger Aff. ¶ 16; Aff. Chad Kaiser ("Kaiser Aff.") ¶ 6, ECF No. 27.  According to Kaiser's and Edinger's testimony, the Valley News Live incident had created "extreme tension" between the two offices.  Edinger Aff. ¶ 15; Kaiser Aff. ¶ 5.  Edinger ordered Nagel to stay out of the Sheriff's Office.  Edinger Aff. ¶ 20; CSC Hearing Transcript at 274:15-21.  Nagel filed his second grievance on January 27, 2016, in which he stated that Edinger had an obligation to put the order in writing.  CSC Hearing Transcript at 218:21-219:2; Edinger Aff., Ex. 3 at 3-4, ECF No.

37-3.  Nagel did not follow through with any of the grievances.
Edinger Aff. ¶ 27; CSC Hearing Transcript at 273:22-274:12.

Meanwhile, the Police Department and Sheriff's Office
requested that the North Dakota Criminal Bureau of Criminal
Investigation ("BCI") conduct a criminal investigation on the
jet-ski issue.  Compl. ¶ 9; Edinger Aff., Ex. 1 ("BCI Report"),
8-9, ECF No. 37-1; Edinger Aff., Ex. 9 ("Edinger's Deposition"),
98:10-99:24, ECF No. 37-9.  Various members of the Jamestown
Police Department and Sheriff's Office were interviewed.  BCI
Report at 2-7, 11-36, 82-96, 112-16.  The BCI never interviewed
Nagel.  Id. at 32-36.  On December 31, 2015, Nagel's attorney
sent another letter to the BCI asserting that Stutsman County
leased a jet-ski and concluding that an enforcement officer had
a "duty to pursue exonerating and exculpatory evidence."  Id. at
109-10.  On February 4, 2016, the BCI investigation closed,
having concluded that the Sheriff's Office did not own a jet-ski
and that there was insufficient evidence to support a criminal
prosecution.  Id. at 62, 122; Nagel Aff. ¶ 8 & Ex. 2.

The Police Department and the Sheriff's Office also
conducted a joint internal investigation of potential violations
related to the Valley News Live report.  Edinger's Deposition at
102:8-103:4; Compl. ¶ 9.  The investigation included thirty
interviews of employees of the Jamestown Police and Sheriff's
Office.  Aff. John Johnson ("Johnson Aff.") ¶ 5, ECF No. 32.

During his interview, Sheriff Kaiser stated that the jet-ski depicted in the picture belonged to his brother-in-law and that the whole incident had caused "huge tension" in both his personal life and at work. Kaiser Aff., Ex. 1, 4:16-24, 11:14-12:7, ECF No. 27-1. He recalled that his wife had taken a picture of Thom and his son on the jetski and sent it to Thom. Id. at 5:6-7, 9:23-10:1. The picture then became public when Thom designated it as his Facebook profile picture. BCI Report at 42. Several of the interviewees affirmed that Nagel knew the source of the anonymous tip sent to Valley News Live. Gross Aff., Ex. 1, 23:1-24:1, ECF No. 35-1; Hirchert Aff. Ex. 1, 10:13-11:12, ECF No. 25-1; CSC Hearing Transcript at 263:10-265:22.; Overvold Aff., Ex. 1, 5:9-6:17, ECF No. 30-1; Falk Aff., Ex. 1 ("Prochnow Interview"), 25:8-14, 27:19-28:2, 49:14-50:23, ECF No. 29-1.

Nagel was the last officer to be interviewed. Johnson Aff. ¶ 8. On February 12, 2016, Johnson sent Nagel an email explaining that he had been assigned to conduct an investigation about the Valley News Live broadcast. Johnson Aff., Ex. 1, 1-2, ECF No. 32-1. On February 15, 2016, Larson sent an email to Johnson saying that Johnson and Edinger's actions violated Nagel's constitutional rights and that Nagel could not be disciplined for exercising his permitted rights. Johnson Aff., Ex. 2, ECF No.32-2. Johnson responded that he was investigating

the Valley News Live incident to determine whether there had
been violations of the Rules and Regulations of the Jamestown
Police Department and that there had been no "complaint."
Johnson Aff., Ex. 3 at 2, ECF No. 32-3.  Larson filed a motion
for a temporary restraining order, or in the alternative, a writ
of mandamus in the District Court of North Dakota.  Johnson
Aff., Ex. 5, ECF No. 32-5.  Larson argued that Nagel's answers
to the investigation could "be used to discipline the employee
including termination of employment."  Id. at ¶ 5.  The court
entered a writ of mandamus excluding any member of the Stutsman
County Sheriff's Department or any other investigative agency
from Nagel's interview.  Johnson Aff., Ex. 6, ECF No. 32-6.

On February 19, 2016, Nagel was interviewed in the presence
of his attorney.  Johnson Aff., Ex. 7, 2:8-15, ECF No. 32-7.
Johnson read Nagel his rights, which included a "right to be
informed of the allegations involved."  Id. at 3:3-4:1.  Johnson
also informed Nagel that his statements could be used to seek
disciplinary action against him.  Id.  During the interview,
Johnson explained to Nagel that he was investigating violations
of the Jamestown Police Department Rules and Regulations and the
Law Enforcement Code of Ethics related to the Valley News Live
incident.  Id. at 4:10-7:2.  In the interview, Nagel was
questioned about the Valley News Live interview and confronted

with evidence from Thom's, Gross's, and Edinger's interviews and evidence from the Valley News Live report. Id. at 17:5-23:20.

The investigative reports concluded that Nagel's actions were directly related to his role as a police officer and had "brought discredit" to the Jamestown Police Department and the Stutsman County Sheriff's Office. Johnson Aff., Ex. 10 at 11, ECF No. 32-10. The report stated that Nagel's responses indicated that Nagel knew who had sent the tip, as Nagel had stated to several of his colleagues. The report concluded that Nagel had lied to the investigators about his knowledge of who was responsible for the tip. Falk Aff., Ex. 3, ¶ 6, ECF No. 29-3. The report recommended that Edinger invoke a review board. Johnson Aff. Ex. 10 at 12.

On February 26, 2016, Edinger empanelled a review board to determine if there were "any policy, procedure, rules, or regulation violations by any Jamestown Police Department officers." Edinger Aff., Ex. 5, ECF No. 37-5. The review board consisted of four Jamestown police officers and one private citizen. Id. The review board unanimously determined that Nagel had violated the Law Enforcement Code of Ethics. Blinsky Aff., Ex. 1 at 7, ECF No. 33-1. It decided that Nagel's behavior had "brought discredit to him and the Jamestown Police Department" and that after knowing the purpose of the interview, "[h]e should have passed the information . . . [to] the chain of

command." Id. at 1. It also concluded that, from the information gathered in the interviews, it was clear that Nagel knew about the incident in July and "did nothing to bring it to light until the news media in November." Id. at 2. In addition, it found that Nagel knew who had sent the tip to Valley News Live, despite the fact that Nagel denied knowing who had sent the package in his interview. Id. at 1-2. The review board unanimously recommended Nagel's dismissal from the department. Id. at 8.

Edinger sent a letter to the City Administrator, Jeff Fuchs ("Fuchs"), stating that Nagel had "violated numerous policies and procedures" and that he was "no longer a viable law enforcement officer." Edinger Aff., Ex. 7, ECF No. 37-7. Fuchs and Katie Andersen, the City's mayor, reviewed the evidence and the review board's recommendation for termination. Andersen Aff. ¶ 4; Fuchs Aff. ¶ 18, ECF No. 31. On March 9, 2017, Fuchs and Andersen terminated Nagel's contract. Andersen Aff. ¶¶ 5-6; Fuchs Aff., Ex. 1, ECF No. 31-1.

Nagel requested a post-termination hearing before the Civil Service Commission. Fuchs Aff., Ex. 2, ECF No. 31-2; CSC Hearing Transcript. On April 27, 2016, a hearing was held in which Nagel called seven witnesses, including five experts. Id. at 25-250. Both the City and Nagel submitted several exhibits. Id. at 253-351; Schmidt Aff., Ex. 7, ECF No. 26-7. Nagel,

Edinger, Johnson, and Falk testified at the hearing.  Id. at
252-351.  Nagel denied being the anonymous tipster or knowing
who had sent the picture.  Id. at 244:8-22; 351:14-25; Nagel
Aff. ¶ 13.  Nagel Aff., ¶¶ 14-18.  On May 20, 2016, the Civil
Service Commission issued its decision, finding that the Review
Board findings were supported by evidence, and denied Nagel's
appeal.  Fuchs Aff., Ex. 3, ECF No. 31-3.

## II.  ANALYSIS

The Defendants are seeking summary judgment in their favor
arguing no constitutional rights were violated.  Defs.' Mem. 39.
Alternatively, they argue that Edinger is entitled to qualified
immunity regarding the constitutional claims.  Id.  They further
argue that there is no cause of action under the North Dakota
Constitution or North Dakota Administrative Code.  Id.  Nagel is
seeking partial summary judgment on all counts except Count I
and the part of Count II alleging free speech and freedom of
association violations.  Pl.'s Mem. 1.

### A.  Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary
judgment is appropriate where the moving party demonstrates that
there exists no genuine issue of material fact and that it is
entitled to judgment as matter of law.  Fed. R. Civ. P. 56(c).
"Where the unresolved issues are primarily legal rather than
factual, summary judgment is particularly appropriate."  Mansker

v. <u>TMG Life Ins. Co.</u>, 54 F.3d 1322, 1326 (8th Cir. 1995). All the inferences must be drawn in favor of the nonmovant. <u>Rynders</u> v. <u>Williams</u>, 650 F.3d 1188, 1194 (8th Cir. 2011).[3] To survive a motion for summary judgment, "[t]he nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial." <u>Metro Sales, Inc.</u> v. <u>Core Consulting Grp., LLC</u>, 275 F. Supp. 3d 1023, 1034 (D. Minn. 2017). If after reviewing all the evidence there are no genuine issues of material fact, "the movant is entitled to judgment as a matter of law." <u>Rynders</u>, 650 F.3d at 1194.

**B. Qualified Immunity**

Government officials are entitled to qualified immunity to protect themselves from the burdens of litigation, unless they incompetently violate clearly established statutory or constitutional rights. <u>Vester</u> v. <u>Hallock</u>, 864 F.3d 884, 886 (8th Cir. 2017). "Qualified immunity gives government officials

---

[3] While this decision faithfully tracks Fed. R. Civ. P. 56(c)(2), completeness requires noting that, where the moving party bears the burden of proof, the nonmovant need not demonstrate such specific opposing facts since the factfinder could disbelieve the evidence proffered. <u>See</u> <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000); <u>see, e.g.</u>, <u>Lund</u> v. <u>Crane Co.</u>, No. 2:13-cv-02776, 2016 WL 2742383, at *13 n.5 (C.D. Cal. May 10, 2016); <u>Securities and Exchange Commission</u> v. <u>EagleEye Asset Mgmt., LLC</u>, 975 F. Supp. 2d 151, 156-57 (D. Mass. 2013); <u>Delano</u> v. <u>Abbott Labs.</u>, 908 F. Supp. 2d 888, 893 (W.D. Tenn. 2012); <u>Anderson</u> v. <u>Potter</u>, 723 F. Supp. 2d 368, 372 n.4 (D. Mass. 2010); <u>Allen</u> v. <u>Murray-Lazarus</u>, 755 F. Supp. 2d 480, 482 n.2 (S.D.N.Y. 2010).

breathing room to make reasonable but mistaken judgments."
Stanton v. Sims, 571 U.S. 3, 5 (2013). Edinger is not entitled
to such immunity if: (i) viewing the facts in a way favorable to
Nagel, he deprived Nagel of a constitutionally protected right,
and (ii) the right was "clearly established" at the time. Jones
v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012). "Clearly
established" means that "a reasonable official would understand
that what he is doing violates [a certain] right," and there
ought be controlling authority or a consensus of cases to put an
officer on notice. Id.; see Plumhoff v. Rickard, 134 S. Ct.
2012, 2023 (2014). A clearly established right "must be
sufficiently clear [so] that a reasonable official would
understand that what he is doing violates that right." Vester,
864 F.3d at 886-87. Defendants have the burden of "proving that
the law was not clearly established." Shockency v. Ramsey Cty.,
493 F.3d 941, 948 (8th Cir. 2007). As explained below, Edinger
did not violate "clearly established" statutory or
constitutional rights, and thus, he is entitled to qualified
immunity.

    **C.   Count I: Violation of First Amendment Rights**

Nagel alleges that the Police Department terminated his
contract in retaliation for his interview with Valley News Live.
Compl. ¶ 23. According to Nagel, this constitutes a violation
of his freedom of speech and freedom of association rights under

the First Amendment and the Federal Civil Rights Act, 42 U.S.C. § 1983. Compl. ¶¶ 21-27. Nagel argues that the resolution of this Count should be preserved for trial since there are disputed factual issues. Pl.'s Mem. 12-13.

To establish retaliation for the exercise of free speech, a public employee has to show that: (i) "[the] speech was protected by the First Amendment," (ii) his contract was terminated, and (iii) the protected speech was the cause of the termination. Rynders, 650 F.3d at 1194. To prove that the speech was protected, Nagel has to show that he spoke as a "citizen on a matter of public concern." McGee v. Public Water Supply, Dist. No. 2, 471 F.3d 918, 920 (8th Cir. 2006).

In his Valley News Live interview, Nagel was not speaking as a citizen on a matter of public concern. Nagel has consistently alleged that he was not speaking as a Jamestown Police Officer but as a Fraternal Order member. Compl. ¶ 8. In Tindle v. Caudell, 56 F.3d 966 (8th Cir. 1995), however, the Eighth Circuit rejected the argument that the public concern test "does not fit cases involving an employee whose expression did not take place at work and was not about work." Id. at 970. In Tindle, the protected expression at issue was made by a police officer while at a Fraternal Order function with other off-duty police officers. Id. at 971. The Eighth Circuit explained that the Fraternal Order "function was related to [the

police officer's] work and caused adverse consequences at work."
Id.; see Lyons v. Vaught, 875 F.3d 1168, 1174 (8th Cir. 2017)
("[A] public employee's speech is not protected by the First
Amendment if it 'owes its existence' to his professional
responsibilities." (quoting McGee, 471 F.3d at 921)).

The Eighth Circuit has also noted that "under the First
Amendment, speech can be 'pursuant to' a public employee's
official job duties even though it is not required by, or
included in, the employee's job description, or in response to a
request by the employer." Lyons, 875 F.3d at 1174 (quoting
Weintraub v. Bd. of Educ., 593 F.3d 196, 203 (2d Cir. 2010)).
In the Valley News Live interview, even though Nagel took his
badge off, he was identified as a Jamestown Police Officer.
Schmidt Aff., Ex. 3 (CD), 1:45-1:52.  The story was entitled
"Fraud and Feud at the Stutsman County Sheriff Office." Id. at
2:39-43.  Nagel's gun and handcuffs were visible during the
interview.  Id.  Thus, a reasonable person would identify Nagel
as a police officer, not as a citizen.

Further, his speech during the interview was not on a
"matter of public concern."  The public concern "must be
determined by the content, form, and context of a given
statement." Connick v. Myers, 461 U.S. 138, 148-49 (1983).
Nagel has asserted different reasons that he gave the interview.
One of the reasons is that he wanted to clear the name of

Dominic Brimm, his Facebook alias. CSC Hearing Transcript at 189:24-190:2; 238:17-22. It thus seems that Nagel raised an issue of his own concern. See Kokkinis v. Ivkovich, 185 F.3d 840, 844 (7th Cir. 1999) ("[I]t is necessary to 'look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?'" (quoting Callaway v. Hafeman, 832 F.2d 414, 417 (7th Cir. 1987))).

Even assuming that Nagel was a citizen speaking on a matter of public concern, he would still not be protected by the First Amendment. "[T]he court must consider whether the interest of the employee, as a citizen, in commenting on matters of public concern outweighs the interest of the state, as an employer, in promoting the efficiency of the public services it performs." Tyler v. City of Mountain Home, Ark., 72 F.3d 568, 570 (8th Cir. 1995). "Factors relevant in weighing the competing interests of the employer and employee are whether the speech creates disharmony in the work place, interferes with the speaker's ability to perform his duties, or impairs working relationships with other employees." Id. Moreover, the Eighth Circuit affords additional deference to police departments with respect to restrictions on speech:

It has been recognized that a <u>police department has a</u> <u>more significant interest than the typical government</u> <u>employer in regulating the speech activities of its</u> <u>employees</u> in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence. Because <u>police departments</u> function as paramilitary organizations charged with maintaining public safety and order, they <u>are given more</u> <u>latitude in their decisions regarding discipline and</u> <u>personnel regulations</u> than an ordinary government employer. The public safety employer's determinations of both the potential for disruption as a result of the speech, as well as the employer's response to the actual or perceived disruption, are entitled to considerable judicial deference.

<u>Id.</u> (emphasis added, internal citations and quotations omitted).

Here, it is clear that the City's interest outweighs that of Nagel. As explained by Sheriff Kaiser, the interview strained the relationship between the Jamestown Police Department and the Sheriff's Office, which work together and are located in the same building. Kaiser Aff., ¶¶ 4-10, Ex. 1 4:16-24; 11:14-12:7; Edinger Aff. ¶¶ 15-20. Edinger also received around 150 complaints from the public. Edinger Aff. ¶ 31, Ex. 8 at 7, ECF No. 37-8. Additionally, the Police had to undergo a BCI investigation and a joint internal investigation. Furthermore, a County Commissioner asked for Nagel's resignation and the Sheriff no longer wanted him in the Sheriff's Office. Edinger Aff. ¶ 13. All in all, each of the Eighth Circuit's factors weigh in favor of the City: the Valley News Live interview created great disharmony in the workplace, interfered

with Nagel's ability to perform his duties, and impaired his working relationships with other employees.

To preclude summary judgment on this count, Nagel argues that a reasonable official would think that his conduct was protected by the First Amendment. Pl.'s Resp. 8. He relies on a decision from the Northern District of Iowa explaining that a reasonableness standard may raise a factual issue that precludes summary judgment. See Bruning ex rel. Bruning v. Carroll Cmty. Sch. Dist., 486 F. Supp. 2d 892, 912 (N.D. Iowa 2007). As the facts are presented here, however, a reasonable official would understand that this issue was closely related to the performance of his job and that he was not speaking as an average "citizen" in the interview.

In addition, Nagel's termination was recommended because of his conduct providing misleading statements during the internal investigation, not simply because he gave the interview. Defs.' Mem. 47. Nagel was not speaking as a citizen during the internal investigation. After the investigation concluded, he was considered a Giglio-impaired officer.[4] Edinger Aff., Ex. 7. In Bradley v. James, the Eighth Circuit ruled that "[a]s a

---

[4] In Giglio v. United States, the Supreme Court held that prosecutors have a duty to disclose evidence regarding the credibility of government witnesses. 405 U.S. 150, 154-55 (1972). Thus, a police officer whose credibility has been damaged is considered a less valuable witness in criminal proceedings, and in turn, a less effective employee.

police officer, Bradley had an official duty to cooperate with the investigation . . . ."  479 F.3d 536, 538 (8th Cir. 2007). Under Bradley, Nagel's responses to his interview during the investigation were not protected by the First Amendment.

Nagel also alleges that his right to freedom of association was violated.  Nagel points out that the fact that the Fraternal Order was prohibited from holding meetings and activities on County properties and required to remove its vending machines and ATM after his interview with Valley News Live shows that his involvement in the Fraternal Order was a factor in his termination.  Pl.'s Opp'n 23.  This fact alone, however, does not rise to the level of a "substantial or motivating factor in the defendant's decision" to terminate his employment.  Wingate v. Gage County Sch. Dist., No. 34, 528 F.3d 1074, 1081–82 (8th Cir. 2008); Davidson v City of Minneapolis, 490 F.3d 648, 654–55 (8th Cir. 2007) ("To establish a prima facie case of retaliation, a plaintiff must allege and prove that: . . . (3) the protected conduct was a substantial or motivating factor in the defendant's decision to take the adverse employment action.").  Nagel fails to identify any other specific facts that would show how his Fraternal Order membership influenced the decision to terminate him.  See Metro Sales, Inc. v. Core Consulting Grp., LLC, 275 F. Supp. 3d 1023, 1034 (D. Minn. 2017) ("The nonmoving party must demonstrate the existence of specific

facts in the record that create a genuine issue for trial."").

Nagel even asserts in his memorandum that "the genesis of this

lawsuit" is in the Valley News Live interview and that "the

television report and <u>nothing else</u> . . . was the catalyst for

the termination".  Pl.'s Opp'n 19 (emphasis added).  Taking

Nagel's various versions of the facts as true, then, no

reasonable juror could believe that his membership in the

Fraternal Order was a substantial factor in his termination.

The Defendants are thus entitled to summary judgment on Count I.

**D.  Count II: Violation of Fourteenth Amendment Rights**

Both parties ask for summary judgment on Count II.  Due

process requires "notice of the charges . . . an explanation of

the employer's evidence, and an opportunity to present [one's]

side of the story."  <u>Berdahl</u> v. <u>North Dakota State Pers. Bd.</u>,

447 N.W.2d 300, 305 (N.D. 1989).  Jamestown Municipal Code § 11-

22(e) allows termination of employees where there is

"misconduct, inefficiency or other just cause."  Jamestown

Municipal Code § 11-22(e).  Nagel alleges that the Defendants

did not provide him with notice of the charges or a pre-

termination hearing, depriving him of his due process rights

under the Fourteenth Amendment.  Compl. ¶¶ 28-36.  To establish

his right to procedural due process, Nagel must show that he has

a property interest in his job and that the requirements of

procedural due process were violated.  <u>Board of Regents of State</u>

Colls. v. Roth, 408 U.S. 564, 576-77 (1972), overruled in part and on other grounds in Paul v. Davis, 424 U.S. 693 (1976). Nagel is a municipal employee and his property right derives from the Jamestown Municipal Code, since he may be terminated only "for cause."  Jamestown Municipal Code § 11-22(e).

The Defendants argue that there was notice because Nagel was informed three different times of the charges against him. Defs.' Opp'n ¶ 21.

The following facts are all undisputed. First, Johnson wrote to Nagel that he was going to be interviewed to determine whether there were any violations of the rules and regulations of the Jamestown Police Department including the Law Enforcement Code of Ethics about the events surrounding the Valley News Live interview.  Johnson Aff., Ex. 5 at 2.  Larson then filed a motion for a temporary restraining order requesting that non-employers be restricted from participating in the interview and stating that the information gained from the interview "may be used to discipline the employee including termination of employment."  Id.  Second, Larson was present during Nagel's interview.  Nagel asked to be informed of the allegations being investigated, to which Johnson answered that Nagel was being investigated for a violation to the Jamestown Police Department rules and regulations surrounding the Valley News Live incident. Johnson Aff., Ex. 7, 4:10-7:2.  Third, the City Administrator

and the City Mayor provided Nagel with a written notice of termination, after which Nagel was provided an extensive post-termination hearing.  Nagel Aff., Ex. 8, ECF No. 45-8.

Given these undisputed facts alone, Nagel was not given an adequate pre-termination hearing and the charges against him were not completely explained.  Nagel was also not given notice of a possible termination.  It is also true, however, that given these facts Nagel knew what was being investigated and that disciplinary actions might arise from the investigation.  Nagel also had two different opportunities to defend himself: the interview in which he was presented with evidence against him and an extensive post-termination hearing.

"[T]he Due Process Clause requires a pre-termination hearing in some form, but if a post-termination hearing is available, the pre-termination proceedings 'need not be elaborate . . . .'"  Sutton v. Bailey, 702 F.3d 444, 447 (8th Cir. 2012) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985)).  "[W]e have consistently held that, where post-termination proceedings are available, 'informal meetings with supervisors' may be sufficient pre-termination hearings."  Pena v. Kindler, 863 F.3d 994, 998 (8th Cir. 2017) (quoting Sutton, 702 F.3d at 447).  "We have repeatedly observed that an employer need not disclose all of the details of the charges against the employee."  Sutton, 702 F.3d at 448.

In <u>Smutka</u> v. <u>City of Hutchinson</u>, the Eighth Circuit reaffirmed that "[e]xtensive post-termination proceedings may cure inadequate pretermination proceedings." 451 F.3d 522, 528 (8th Cir. 2006) (quoting <u>Krentz</u> v. <u>Robertson Fire Prot. Dist.</u>, 228 F.3d 877, 902 (8th Cir. 2000)). Nathan Smutka ("Smutka") was an employer for the Hutchinson Utilities Commission ("HUC"). <u>Id.</u> at 523. After learning that his HUC credit card was not working, Smutka had an outburst in the break room. <u>Id.</u> at 524. An investigation of the incident was initiated by the City Attorney and the City's Human Resource Director. <u>Id.</u> They first met with Smutka to inform him of the allegations of the breakroom incident, and they later met with Smutka and his attorney, again informing him of the incident being investigated. <u>Id.</u> Smutka's attorney submitted a written response to the allegations of misconduct. <u>Id.</u> at 525. Four days later, Smutka's employers delivered a letter terminating his employment. <u>Id.</u> Smutka appealed his termination and requested an independent review by the Bureau of Mediation Services ("BMS"). <u>Id.</u> A BMS officer held a trial-like hearing, allowing the parties to submit post-hearing briefs, and concluded there was no just cause to support the termination and that the HUC had not followed its policies in terminating Smutka's employment. <u>Id.</u> Smutka's employment was reinstated

and Smutka shortly thereafter filed a federal lawsuit alleging that he was denied pre-termination due process.  Id. at 526.

On appeal from a grant of summary judgment to the defendants, the Eighth Circuit concluded that Smutka's pre-termination proceedings were sufficient.  Id. at 527.  It noted that Smutka "knew enough about the incident to prepare a response" and that HUC "was not required to provide [Smutka] with a full [pre-termination] hearing, nor was [HUC] required to disclose all of the details of the charges."  Id. at 527. (quoting Schleck v. Ramsey County, 939 F.2d 638, 642 (8th Cir. 1991) (alteration in original)).  The court concluded that Smutka had two different opportunities to respond to the misconduct charge, "one with the assistance of counsel," and that Smutka's comprehensive post-termination proceedings could cure "superficial pretermination proceedings."  Id.

Nagel's case is similar to that of Smutka.  Johnson met with Nagel in the presence of Nagel's attorney before his termination to discuss the events surrounding the Valley News Live interview and confronted him with evidence from other witnesses.  Nagel denied the allegations against him with his attorney present.  Nagel also appealed the termination to the Civil Service Commission, where he was afforded a trial-like hearing in which he presented various expert witness and around 100 exhibits and was allowed the opportunity to submit closing

briefs.  Schmidt Aff., Ex. 2; Schmidt Aff. Ex. 7; Schmidt Aff.,

Ex. 1.  Any defect in Nagel's pre-termination due process was

cured by the extensive post-termination hearing.  Thus, Nagel's

due process rights were not violated.

    **E.**    **Count III: Violation of the North Dakota Constitution**

Nagel argues that the above-mentioned violations are also

violations of his rights of freedom of speech, freedom of

association, and due process under Article 1, sections 4, 5, and

9 of the North Dakota Constitution.  Compl. ¶¶ 37-42.  As the

Defendants point out, however, Nagel has no direct cause of

action under the North Dakota Constitution.  Defs.' Mem. ¶ 111.

While Nagel may seek the vindication of his federal

constitutional rights under 18 U.S.C. § 1983, there is no

corresponding North Dakota statute authorizing the vindication

of rights secured by the North Dakota Constitution.  In

Kristensen v. Strinden, 343 N.W.2d 67 (N.D. 1983), the North

Dakota Supreme Court explained that there was no direct cause of

action for damages for violations of the North Dakota

Constitution where North Dakota courts had not yet implied one.

Id. at 70.  It further noted that no North Dakota court has

recognized a direct cause of action for money damages for a

violation of the North Dakota constitutional provisions at

issue, including Article I, section 4.  Id.  In a recent order

granting summary judgment, another court in this District

concluded that since the North Dakota Supreme Court has not

"inferred a private right of action under the state

constitution. . . [t]his Court will not take the extraordinary

step of inferring one."  Order, <u>Sander</u> v. <u>City of Dickinson</u>,

Case No. 1:15-cv-72, J. Hovland, 2018, ECF No. 124.

There are also, however, no North Dakota Supreme Court

cases that deny a right of action under the state constitution.

Therefore, Nagel's claims in Count III are dismissed without

prejudice.  He may pursue his North Dakota constitutional claims

in the courts of that state.

**F.    Count IV: Violation of North Dakota Administrative
        Code**

Finally, Nagel alleges that the City's failure to provide

him with pre-termination notice, opportunity to be heard, and

written final action notice before discharging him violated

chapter 4-07-19 of the North Dakota Administrative Code.  Compl.

¶¶ 43-46.  This chapter requires that prior to discharging a

"regular employee," the State ought provide the employee with a

pre-termination notice and a written final action.  N.D. Admin.

Code 4-07-19-05, 4-07-19-06.  The chapter also asserts that a

public sector employee may be disciplined only for cause.  <u>Id.</u>

at 4-07-19-03.

Nagel's claim fails as matter of law because chapter 4-07-

19 only applies to state employees or employees of local

governments "in [a] position[] classified by human resource management services."  N.D. Admin. Code 4-07-19-01 (policies and rules that applies to employees in the state); see Lee v. Walstad, 368 N.W.2d 542, 546-47 (N.D. 1985) (declining to hold that a city chief of police has a property interest in his employment under North Dakota law).  Nagel is a city employee, not a state employee, and his position as a city police officer is not classified by "human resource management" -- an organization under the auspices of the state Office of Management and Budget -- as a "regular employee" within the meaning of chapter 4-04-19.  See N.D. Cent. Code § 54-44.3-12; N.D. Admin. Code 4-07-19-01.  Therefore, this Court GRANTS the Defendants' motion for summary judgment on this count.

## IV. CONCLUSION

For the foregoing reasons, this Court GRANTS Defendants motion for summary judgment on Counts 1, 2 and 4 and DENIES Nagel's motion for partial summary judgment on Count 2, part of Count 3 and Count 4.  The Court dismisses Nagel's claims in Count 3 without prejudice.  Judgment shall enter for the Defendants.

**SO ORDERED.**


/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE